Halbruegger v. City of St. Louis.

---

Headnotes 1, 2 and 3:   Elections: 1, 20 C. J. sec. 250; 2, 20 C. J. sec. 270 (1926 Anno); 3, 20 C. J. sec. 351 (1926 Anno).   Headnote 4: Prohibition, 32 Cyc. 602, 625.

---

MAYNE G. HALBRUEGGER, Appellant, v. CITY OF ST. LOUIS et al.

In Banc, February 28, 1924.

1. **PUBLIC PURPOSE:** Municipal Auditorium and Community Center Building. The purpose sought to be effectuated by the submission to the legal voters of the city of St. Louis of a proposal to vote five million dollars of bonds "for the acquisition of a site and the erection thereon of a civic building to be known as the 'Municipal Auditorium and Community Center Building,' to be used for the holding of public meetings, gatherings and conventions for the discussion of public questions, including matters submitted to the people under the referendum or the initiative, and to provide suitable meeting places for educational, moral, industrial, labor and other purposes," is a public purpose, and the issuance of the bonds for such purpose is authorized by the statutes and city charter.

2. ———: Constitutional Restriction: Enlarging Meaning of Names Employed: Disconnected from Declared Purpose. In determining whether the purpose declared in a proposal to issue bonds to

erect a "civic building" violates the provision of the Constitution declaring that "taxes may be levied and collected for public purposes only" such words as "auditorium" and "conventions" should not be given an enlarged and inimical meaning apart from the purposes declared as the uses to which the building is to be put, but the purpose is to be ascertained by reading such words in connection with their context declaring the purpose.

3. ———: Other Purposes: Ejusdem Generis. The words "and other purposes" used in the proposal that the "civic building" is to be used, "to provide suitable meeting places for educational, moral, musical, industrial and other purposes," are to be construed in harmony with the preceding particular specifications. Besides, such words are not permitted to offend against the provision of the Constitution declaring that "taxes may be levied and collected for public purposes only."

4. ———: Charter: Constitutional Limitation. The power of the city of St. Louis to frame its own charter is not unrestricted; the charter must be in harmony with and subject to the Constitution and laws of the State, and the General Assembly has the same powers over that city that it has over other cities, nor can the charter disregard the requirements of the U. S. Constitution. But subject to these limitations and restrictions, the power to frame a charter authorizing the city to levy and collect taxes and make provision for incurring indebtedness and issuing bonds to raise money for effectuating public purposes is lodged in the city by the Constitution.

5. ———: ———: Legislative Exercise: Interference. A charter so framed as to include a legitimate public purpose is the exercise by the city of St. Louis of legislative power, and a legislative discretion in its exercise is entitled to weight, for its very exercise implies a legislative finding that the purpose is a public one, and the courts will not interfere unless clearly satisfied that the purpose is not public.

6. ———: Legislative Exercise: By General Assembly in Behalf of Other Cities. A statute enacted by the General Assembly (Sec. 9089, R. S. 1919) authorizing all cities having less than thirty thousand inhabitants to erect or acquire "a public auditorium or convention hall" was a legislative finding that a charter provision of the city of St. Louis authorizing it to acquire a site and erect a building thereon for the same purpose is the use of the taxing power for a public purpose—there being no statute forbidding the city to erect a like structure. Such a statute declares the legislative policy.

Halbruegger v. City of St. Louis.

7. ———: **Judicial Interference.** To justify judicial interference to defeat an adopted purpose on the single ground that it is not a public purpose, the violation of the constitutional provision that taxes may be levied only for a public purpose must be clear, and the reason for interference strong. The question whether a purpose is a public one is usually one of policy for the legislative department, and becomes one of law only when it clearly and convincingly appears that the power to be exercised in furtherance of the policy adopted does not reside in the legislative body.

8. ———: **Changed Conditions.** Previous custom and usage in the expenditure of public money is not determinative of the question whether the purpose for which bonds have been voted is a public purpose. Conditions change, and there is no fixed standard or inflexible rule by which it can be definitely determined what is a public purpose.

9. ———: **Public Hall.** It cannot be judicially said that to erect a civic building or auditorium, disconnected with city offices, as a place where the people may assemble for the purpose of securing and disseminating information and interchanging views, and the better to diffuse light and knowledge on all subjects which will advance the cause of education and morals, especially where the charter retains in the people the power of initiating legislation and rejecting or approving municipal enactments, and because of which public discussion tends to promote the public welfare, is not to use the taxing power of a large city for a public purpose.

10. ———: **Intent to Use Unlawfully.** A secret intent of certain individuals to use the proposed building, designed as a place of peaceable assembly for the common good, for purposes not public, will not render illegal a purpose which in itself is legal. If the building is perverted to unlawful uses, the law affords a remedy.

11. ———: **Power to Use Public Money: Statutory and Charter Authority.** The statutes (Secs. 8656, 8659, R. S. 1919) authorizing the city of St. Louis to contract debts, and to issue bonds evidencing such debts, for any purpose authorized in its charter, and charter provisions (Par. 8, sec. 1, art. 1) declaring that the city shall have power "to acquire or receive and hold, maintain, improve, sell, lease, mortgage, pledge or otherwise dispose of property, real or personal, within or without the city or State," and (Par. 5, sec. 1, art. 1) "to acquire, provide for, construct, regulate and maintain and do all things relating to all kinds of public buildings, structures, markets, places, works and improvements," and (Par. 35, sec. 1, art. 1) "to exercise all powers granted or not prohibited by law" and (Sec. 1, art. 17) to issue

bonds "for courthouses and other public buildings, public parks, parkways, boulevards, grounds, squares, river and other public improvements which the city may be authorized and permitted to make," authorize the city to use public money or vote bonds for a public purpose, such as the buying of a site and the erection of a civic building thereon "to be used for the holding of public meetings, gatherings and conventions for the discussion of public questions" and "to provide suitable meeting places for educational, moral, musical, industrial, labor and other purposes."

Appeal from St. Louis City Circuit Court.—*Hon. Wm. H. Killoren*, Judge.

AFFIRMED.

*Lemen, Field & Flynn* for appellant.

The proposition provides as follows: "Thirteen. Bonds numbered 57,751 to 62,750, both inclusive, five million dollars, and the proceeds from their sale, shall be used 'For the acquisition of a site and the erection thereon of a civic building to be known as the "Municipal Auditorium and Community Center Building," to be used for the holding of public meetings, gatherings and conventions for the discussion of public questions, including matters submitted to the people under the referendum or the initiative, and to provide suitable meeting places for educational, moral, musical, industrial, labor and other purposes.'" These other purposes quoted are private purposes. It is purposed to hold all kinds of private conventions in this building. A municipality has no right to tax its citizens for "private purposes." Since this feature appears from the face of the ordinance, complainants must act now or forever hold their peace. Kingman v. Brockton, 153 Mass. 225; C. E. Brooks v. Incorporated Town of Brooklyn, 124 N. W. 868.

*George F. Haid* and *Oliver Senti* for respondents; *Charles & Rutherford* of counsel.

(1) A municipal auditorium or other public hall to be used generally by the public is a public use or public purpose. 6 Corpus Juris, 863, 864; Clarke v. Town of Brookfield, 81 Mo. 503; State ex rel. v. Haynes, 72 Mo. 377; Denver v. Hallett, 34 Colo. 393; Greenbanks v. Boutwell, 43 Vt. 207; Ross v. Long Branch, 73 N. J. L. 292; Wheelock v. Lowell, 196 Mass. 220; Hightower v. Raleigh, 150 N. C. 560; Egan v. San Francisco, 165 Cal. 576; Los Angeles v. Dodge, 51 Cal. App. 492; Town of Beaver Dam v. Frings, 17 Wis. 398. (2) Inasmuch as a municipal auditorium sustains the same relation to a large city that a public hall or a general municipal building sustains to a small town, the case at bar falls within the principles declared by this court in the cases of State ex rel. v. Haynes, 72 Mo. 377, and Clarke v. Town of Brookfield, 81 Mo. 503. (3) It is no longer the law that when determining what is a public purpose a city must be controlled by absolute necessity or by a narrow interpretation of the Constitution. Things which contribute to the comfort and happiness of citizens, as well as those occasioned by absolute necessity, are included within the term "public purpose." State ex rel. v. O'Rear, 277 Mo. 303; Schieffelin v. Hylan, 236 N. Y. 254; United States v. Gettysburg El. R. Co., 160 U. S. 681. (4) The word "auditorium" is not used in the charter. But the power of the city to erect such a building is included within the power granted. Charter, Art. I, sec. 1, pars. 8, 15, 32, 33 and 35; Article I, sec. 2; Article 17, sec. 1; St. Louis v. Baskowitz, 273 Mo. 545. (a) It is not necessary that there be an express power to issue bonds for a certain purpose, provided there exists power to exercise the function on account of which the bonds are to be issued. R. S. 1919, sec. 8656, 8659; State ex rel. v. Hackmann, 280 Mo. 586; Wheelock v. Lowell, 196 Mass. 220; Hightower v. Raleigh, 150 N. C. 569; Egan v. San Francisco, 165 Cal. 576; Los Angeles v. Dodge, 51 Cal. App. 496. (5) The words "public use" are in some jurisdictions held to be synonymous with the words "public utility." State v. Barnes, 22 Okla. 195; City of Belton v. Ellis, 254 S. W. 1023. (a) The General Assembly has

302 Mo. Sup.—37.

conferred upon cities smaller than St. Louis the express authority to construct auditoriums, convention halls and memorial buildings (R. S. 1919, sec. 9089; Laws 1923, pp. 281, 282); and, in one or more of these statutes, has declared them (or some of them) to be public utilities. (b) When there has been a legislative declaration that a use or purpose is a public one, the judgment of the Legislature will be respected by the courts unless the use be palpably without reasonable foundation. Dillon on Munic. Corpns. (4 Ed.) sec. 600; United States v. Gettysburg El. R. Co., 160 U. S. 680. Especially if sanctioned by time and the acquiescence of the public. State ex rel. v. O'Rear, 277 Mo. 303, 320. (c) It would certainly be an anomaly if larger cities, such as St. Louis and Kansas City, did not possess a similar power. The conferring of express power upon smaller cities cannot be construed as a denial of power to the city of St. Louis; and the fact that in some instances special statutory authority has been obtained does not militate against the existence of a general power. Wheelock v. Lowell, 196 Mass. 224; Hightower v. Raleigh, 150 N. C. 569. (d) St. Louis is authorized by its Charter to issue bonds for any public utility, for any public building or for any public purpose. Charter, art. 17, sec. 1. (6) It cannot be assumed that a building adapted for public purposes is to be used for other purposes. Ross v. Long Branch, 73 N. J. L. 292, (a) Under the *ejusdem generis* rule, the words "other purposes" mean other public purposes. St. Louis v. Laughlin, 49 Mo. 559; Ex parte Joseph Neet, 157 Mo. 535; Williams v. Railroad, 233 Mo. 678. (7) When an instrument is susceptible of two constructions, one of which will render it invalid and the other of which will render it valid, the courts will adopt the latter construction. Hunter W. Finch & Co. v. Senith Furn., 146 Ill. 257, 277; Minn. Lum. Co. v. White Breast Coal Co., 160 Ill. 85; Ormes v. Dauchy, 82 N. Y. 443, 446; Curtis v. Gokey, 68 N. Y. 304; Crittenden v. French, 21 Ill. 598, 600; Cochran v. County of Vermilion, 113 Ill. App. 144; Natl. Hollow

Brake Beam v. Interchangeable B. B. Co., 106 Fed. 715;
O. H. Jewell Filter Co. v. Jackson, 140 Fed. 343.'

JAMES T. BLAIR, J.—Appellant is a taxpaying
citizen of the city of St. Louis and appeals from an ad-
verse judgment in a suit she brought to enjoin the city,
its mayor, comptroller and treasurer from issuing bonds
voted to procure money to acquire a site and erect "a
civic building to be known as the 'Municipal Auditorium
and Community Center Building'" in the city of St.
Louis.

The petition alleges the various steps taken pre-
liminary to the holding of the bond election, the manner
of holding the election and the casting of a decided ma-
jority of the votes for the bonds for the purpose men-
tioned, the several things done by the Board of Election
Commissioners following the election and by the Board of
Aldermen and the Board of Estimate and Improvement
toward the issuance of bonds for the purpose in question,
sets out the ordinance directing the bonds to be issued,
wherein detailed provision is made to that end, alleges
that certain bonds have been sold and others are about to
be sold, and prays that the issuance and sale of bonds
for the erection of the civic building named be forever en-
joined, on the ground that the purpose for which their
proceeds are to be used is not a public purpose within the
meaning of Sections 3 and 11 of Article X of the State
Constitution and of Section 1 of Article I and Section 1
of Article XVII of the Charter of the City of St. Louis.
A demurrer to the petition was filed and sustained. Ap-
pellant refused to plead further. Judgment was rendered,
and this appeal followed.

The proposition submitted and carried and here at-
tacked was one of several separately submitted at the
same election. Each proposal for bonds was part of a
general and harmonious plan which included numerous
improvements of various kinds. The proposal as sub-
mitted was as follows:

"For the acquisition of a site and the erection there-
on of a civic building to be known as the 'Municipal Audi-

torium and Community Center Building,' to be used for the holding of public meetings, gatherings and conventions for the discussion of public questions, including matters submitted to the people under the referendum or the initiative, and to provide suitable meeting places for educational, moral, musical, industrial, labor and other purposes, five million dollars ($5,000,000)."

No part of the proceedings in preparation for the submission of the proposition, no feature of the election as held, and no matter or transaction subsequent to the election is attacked or criticised by appellant in any respect as the general invalidity of the whole is impliedly questioned by the insistence that the city has no lawful power to incur indebtedness for the purpose evidenced by the proposal in question. The argument in support of appellant's contention falls under two general heads: (1) That the purpose the proposal is designed to effectuate is not a public purpose, and (2) that, in any event, neither statute nor charter authorizes the city to vote and issue bonds for the erection of a building such as is described in the proposal.

I. It is earnestly contended that the purpose intended to be accomplished under the proposal submitted is not a public purpose, but a private one, within the meaning of Section 3 of Article X of the State Constitution, which, in so far as it is pertinent, reads: "Taxes may be levied and collected for public purposes only." This constitutional clause is but the formulation of a restrictive principle inherent in the nature of free government.

1. Appellant's argument is, to some extent, based upon her construction of the proposal she attacks. In this connection the word "auditorium" is given some prominence, the term "convention hall" is Particular used, and the final words "and other purWords and poses" are considerably emphasized. The Names. proposal submitted, apart from the name chosen, separately defines the uses for which the contemplated structure is designed. It is obvious that in

arriving at the purpose in mind the direct and express declaration thereof is not to be given an unlawful meaning because of inferences which might be drawn, justifiably or not, from words used in a mere name chosen to designate the building. The question is not whether a fitting name has been selected, but whether the purpose announced is a public one. Nor is the word "convention," as used, to be taken out of its context, invested, if may be, with a meaning inimical to the legality of the whole and then restored to its place and used to defeat a purpose otherwise lawful. The inquiry is not whether this proposal can, by some possibility, be construed so as to bring it into conflict with the Constitution. The question is whether the purpose declared, when it is fairly ascertained, is defeated by the principle stated in the quoted constitutional provision. The parts of the proposal which define the purpose sought to be effectuated read: "For the acquisition of a site and the erection thereon of a civic building . . . to be used for the holding of public meetings, gatherings and conventions for the discussion of public questions . . . and to provide suitable meeting places for educational, moral, musical, industrial, labor and other purposes." The clause which gives the building a name has, in the circumstances, little to do with the purpose of the proposal, and that which provides that questions discussible in the building shall include "matters submitted to the people under the referendum or the initiative" is illustrative. The words "and other purposes" are said to open up the purpose clauses so as to let in all sorts of private purposes, and thereby render invalid the proposal and the authorization to issue bonds. If the preceding matter does not offend against the principle stated in Section 3 of Article X, a question to be considered in another connection, then the words "and other purposes" do not do so, since it is a well settled rule that general words of this sort are to be construed in harmony with the particular specifications which precede

them, unless a contrary intent appears from other language used or from the circumstances—e. g. the exhaustion of a class by the particular terms employed. In addition, if room for doubt exists, another familiar canon precludes a construction of these words which would cause the proposal to offend against the constitutional provision.

2. Is the purpose, as declared, a public one? The power of the city of St. Louis to frame its own charter (Art. IX, Constitution) is not unrestricted. Any charter framed by it must be "in harmony with and subject to the Constitution and laws of Missouri," and the General Assembly shall have the same power over the city . . . of St. Louis that it has over other cities of this State." Neither can requirements of the Federal Constitution be disregarded in charter framing. Nevertheless, subject to these restrictions and limitations, the power to frame a charter authorizing the city to levy and collect taxes and make provision for incurring indebtedness and issuing bonds to raise money for effectuating public purposes is lodged in the city by the Constitution of the State. [City of St. Louis v. Bircher, 76 Mo. 1, c. 433.] This is essentially a legislative power. If the city has so framed its charter as to include such a purpose as that under consideration, that is the exertion of legislative power; and in approaching the solution of the question of its validity under Section 3 of Article XI of the Constitution, the legislative discretion exercised therein is entitled to weight. [County of Los Angeles v. Dodge, 51 Cal. App. l. c. 498 et seq.] There is implicated in such legislative act a finding that the purpose is a public one, and this finding is not to be overturned by the judiciary unless the court is "clearly satisfied that an error has been committed." [1 Cooley on Taxation, pp. 184, 185; Gray on Lim. of Taxing Power and Public Indebtedness, sec. 178.] In this case there is also the fact that the Legislature has authorized all cities of the second class (Laws

*Margin note: Public Purpose.*

1923, p. 281) and all cities, towns and villages, having less than thirty thousand inhabitants, to erect or acquire "a public auditorium or convention hall." [Sec. 9089, R. S. 1919] In the process of passing these acts the State Legislature necessarily determined that the erection or acquisition of such structures was a public purpose. The fact that the section applies to only part of the cities of the State does not affect the finding mentioned. Not the character of the finding, but only the extent of the declared legislative policy is limited. There is no act which forbids St. Louis to erect a like structure. That matter is left to the Charter and the Constitution. There is no dissent from the doctrine that to justify judicial interference to defeat an adopted purpose on the single ground that it is not a public purpose, the violation of the principle must be clear and the reason for interference strong. As has been observed by courts and text-writers, there are instances in which there can be no reasonable doubt that the purpose attempted to be effectuated is not a public purpose. There are others in which it is clear that the purpose is public. Between these two cases lies disputed ground within which the courts are inclined to give much consideration to the effect of the legislative finding which is essentially involved in every legislative declaration that public money may be used for a stated purpose. In solving the question whether a particular purpose is a public one it is not necessary in this case to attempt the formulation of a general rule inflexibly applicable under all circumstances. Efforts of this sort several times have proved not entirely successful. Illustrative of this is the statement of a rule that previous custom and usage in the expenditure of public moneys was determinative of the whole matter. It has been pointed out that the rigid adherence to a standard of that kind clearly would interfere with progress and would defeat the effectuation of a purpose which changed conditions of life and circumstances would demonstrate to be public (State ex rel.

Recl. Bd. v. Clausen, 110 Wash. 540), and would defeat it not because such purpose was not a public one at the time it was submitted, but because it was not recognized as a public purpose at a previous time when different conditions existed which were not such as then to permit of the presentation or consideration of the question whether such purpose was public or private in the sense of the principle appellant invokes. Further, that rule would retain in the law, as appropriate for the expenditure of public money, purposes which, though once recognized as public, long since have passed from that category by reason of changes in conditions. With respect to the question in hand, strong language has been used by some of the courts, and limitations thereof have been suggested. [1 Cooley on Taxation, pp. 185, 186.] In harmony with this is said in Gray's Limitation of Taxing Power & Public Indebtedness, sec. 178: "The courts do not interpret this rule of limitation in any narrow sense. The necessities of government and the importance of its being carried on with as little interference as is consistent with a due regard to the rights of the citizens render them reluctant to declare that the limitation has been transgressed in any given case. As the Legislature is the primary judge of what is a proper purpose for the application of the money to be raised by taxation, and is a co-ordinate branch of the government especially charged with that duty, its excess of its rightful authority must be quite clear, the case must plainly be one in which the legislative department has overstepped its legitimate boundaries, before the judicial department will undertake to nullify its acts." This generalization does not overstate the judicial reluctance apparent in the cases. [Perry v. Keene, 56 N. H. l. c. 534.] Nor does actual "necessity" delimit the purposes which are public in this sense. In a case (People v. Town of Salem, 20 Mich. 452) cited by Mr. Gray, Judge Cooley wrote: "Necessity alone is not the test by which the limits of state authority in this direction are to be de-

fined, but a wise statesmanship must look beyond the expenditures which are absolutely needful to the continued existence of organized government, and embrace others which may tend to make that government subserve the general well-being of society, and advance the present and prospective happiness of the people.  To erect the public buildings, to compensate the public officers and to discharge the public debts, are not the sole purposes to which the public revenues may be applied,' but, on the contrary, considerations of natural equity, gratitude and charity are never out of place when the general good of the whole people is in question, and may be kept in view in the imposition of public burdens." The question is usually one of policy for the legislative department and becomes one of law only when it clearly and convincingly appears that the *power* to be exerted in furtherance of the policy adopted does not reside in the legislative body.

In State ex rel. Jordon v. Haynes, 72 Mo. 377, this court upheld a tax levied by a township for the purpose of acquiring a site and erecting a "township hall."  In Clarke v. Inhabitants of Brookfield, 81 Mo. l. c. 512, 513, the court said: "The learned counsel of defendant criticises that part of the condition which requires the building to contain a 'public hall,' arguing that such a room could not be for the use or benefit of the town.  It may be observed that the condition in the deed does not purport to contain the plans or specifications of the contemplated structure.  The general character of the structure is indicated in the easy use of popular terms.  The words 'public' and 'public good' obviously relate to the town or town benefit, which, as embracing the good of the inhabitants of a large town, is not improperly designated as 'public' or 'public good.'  A hall in which the trustees might find it proper to conduct their sessions in public, in which elections may be held, and where the inhabitants of the town may assemble to consider and discuss matters of public importance, would not, I con-

ceive, be foreign to the uses and benefits to which the property of the corporation may be reasonably devoted. Accommodations of this character, such as Independence Hall and Faneuil Hall, are so familiarly associated with the early history of this nation, as nurseries of its infant liberty, that I am reluctant to believe that, in the course of a century, they have ceased to be in accord with the life and weal of American towns. Public halls and popular assemblies are out of place only in governments conducted by despots, where the people have no power and no voice. In a government where they have to assemble for the purpose of considering and discussing their public affairs, a convenient and commodious hall for them to assemble in, is, in my opinion, a proper and necessary want of the inhabitants of every town.''

. There seems to be no dissent from the rule that the erection of a city hall is within corporate purposes of municipalities and that a room for public assemblages may be included therein and paid for with public money. [Town of Beaver Dam v. Frings, 17 Wis. 398, cited in State ex rel. Jordon v. Haynes, supra; Torrent v. Muskegon, 47 Mich. 115; Hightower v. Raleigh, 150 N. C. 569; Ross v. Long Branch, 73 N. J. L. 292; Wheelock v. City of Lowell, 196 Mass. l. c. 224; Denver v. Hallett, 34 Colo. l. c. 405, et seq., and cases cited; White v. Town of Stamford, 37 Conn. 586; Greeley v. People, 60 Ill. l. c. 22; Bates v. Bassett, 60 Vt. 534; Callam v. Saginaw, 50 Mich. l. c. 10; Parker v. Concord, 71 N. H. l. c. 471.]

In Wheelock v. City of Lowell, 196 Mass. 220, it was proposed to erect a public hall to replace a building which had been destroyed by fire and which had been theretofore used by various sorts of public assemblages. The city had another building in which its officers and boards were adequately housed. The suit was to restrain the expenditure. The court said, in part: ''The reported facts show a substantial use of Huntington Hall for political rallies, conventions and other public meet-

ings of citizens, although from time to time it has been
rented for purposes of amusement and instruction.   That
the building has been also let for private uses, when not
required by the public needs, does not affect the general
legal purpose.  .  .  .  It is hard to overestimate the
historical significance and patriotic influence of the pub-
lic meetings held in all the towns of Massachusetts be-
fore and during the Revolution.   No small part of the
capacity for honest and efficient local government mani-
fested by the people of this commonwealth has been due
to the training of citizens in the forum of the town meet-
ings.  .  .  .  The practical instruction of the citizen
in affairs of government ·through the instrumentality of
public meetings and face-to-face discussions may be re-
garded quite as important as their amusement, edifica-
tion or assumed temporal advancement in ways hereto-
fore expressly authorized by statute and held constitu-
tional.  .  ·.  .  A commodious and convenient hall in
which the citizens are to exercise their right of assembling
and discussing public affairs is therefore an object for
which the defendant city may legally spend money.''
Numerous authorities are cited.

In Egan v. San Francisco, 165 Cal. 1. c. 581, 582, the
court said:  ''The trend of authority, in more recent
years, has been in the direction of permitting munici-
palities a wider range in undertaking to promote the
public welfare or enjoyment.   Thus, the appropriation
of money for public concerts has been held to be proper
under a statute authorizing appropriations for armories,
for the celebration of holidays, and for 'other public pur-
poses.'  [Hubbard v. Taunton, 140 Mass. 467, 5 N. E.
158.]  So, too, the erection of an auditorium has been
regarded as properly falling within the purposes for
which a municipal corporation may provide by charter.
[Denver v. Hallett, 34 Colo. 393, 83 Pac. 1066.]   Similar
views have been expressed in a case involving the levy
of taxes for the purpose of building a hall to be used
as a memorial to soldiers and sailors who served in the

War of the Rebellion. [Kingman v. Brockton, 153 Mass. 255, 11 L. R. A. 123, 26 N. E. 998.] Generally speaking, anything calculated to promote the education, the recreation or the pleasure of the public is to be included within the legitimate domain of public purposes. [Hubbard v. Taunton, 140 Mass. 467, 5 N. E. 158; Spires v. Los Angeles, 150 Cal. 64, 11 Ann. Cas. 465, 87 Pac. 1026; Laird v. Pittsburg, 205 Pa. St. 1, 61 L. R. A. 332, 54 Atl. 324.]''

While the character of the building involved in that case is unlike that in this case, the applicability of the rule *to this case* is not affected. In State ex rel. v. Barnes, 22 Okla. l. c. 199, the question was whether the erection of a ''convention hall'' was a public purpose. Among other things the court said: ''In a government where the right of public assembly for the redress of grievance is guaranteed to the people, where the policies of government are in a great measure determined at public gatherings of the people in political conventions, where the lecture platform has become so important a factor in public education, and where people frequently assemble for the purpose of discussing and devising ways and means of promoting their varied interests, a place in large cities where such gatherings may be had under comfortable hygienic conditions is not only a public convenience and benefit, but a public necessity. We know of no case in which the question of whether a convention hall is a public use has been determined, but courthouses, jails, schoolhouses, city halls, public markets, almshouses, public parks, boulevards, commons or pleasure grounds, and places of historic interest are examples of uses that have been declared by the courts to be 'public uses.' [2 Abbott's Municipal Corporations, pp. 1828-1830.] And the reasoning upon which the courts have declared that these various uses are public uses is applicable to the case at bar.''

In Denver v. Hallett, supra, the question was whether the erection of an ''auditorium'' was a public purpose.

The court reviews the cases and answers in the affirmative. In Wilkerson v. Lexington, 188 Ky. 381, a decision to the same effect on a somewhat analogous question is found. [See 3 McQuillin, Mun. Corps., sec. 1117, p. 2479.] With respect to our own cited decisions, the halls involved in them were proper objects of expenditure by the respective municipalities because the halls themselves were suitable and intended for public use. Their construction out of public funds could not otherwise be defended. The fact that by certain devices known as nails, mortar, mortises and tenons, the walls of these rooms were attached to or superimposed on a structure clearly of public use (if they were) could not save them from falling without the term "public use" unless they had in themselves something of the character which brought them, or, in the course of reasonably to be anticipated development, might bring them within that term. If a public hall legally may be erected by a municipality out of public funds at all, it is because it serves or may serve a public use within the meaning of the Constitution. It is settled law, generally, in Missouri and elsewhere, that it does serve such a use. If so, it is because it serves that use and not because it is nailed on top of or beside a number of rooms designated "city offices," or the like. The right of the people "peaceably to assemble for their common good" is thought of sufficient importance to justify its protection by constitutional provision from all interference. The duty to assemble for the purpose of securing and disseminating information and interchanging views on public questions is becoming increasingly obligatory. The increase of opportunities for assembling for the better diffusion of "light and knowledge" on all subjects which will advance the cause of education and morals among the people of a community will aid in contributing to the general welfare the progressive influences of moral and cultural forces which are essential to the advancement of the race. The policy of our people, evidenced by the Con-

stitution and the charter of St. Louis and other cities, is to retain in themselves the power to initiate legislation and veto acts of the law-making body. By this means the people of each community become a constituent part of a great legislative body which acts for the whole State, and, on occasion, become the municipal legislature. Public discussion of such questions fairly calls for a place where it can be held, and such public discussion is a reasonable means whereby the electorate can aid itself or be aided in arriving at the conclusions it has become its duty to form in furtherance of the public good under an adopted policy. In many matters of local and even more general concern the need of the citizens of a municipality for a convenient and adequate place of assemblage is too obvious to require particularization. The arts and sciences require places for display of their works. The cause of education can be served in many ways by such a structure. When all these things are considered we find no difficulty in holding that, under the generally approved rule stated above, the court cannot say the purpose evidenced by the proposal in question is not a public one within the meaning of the principle formulated in the quoted provision of the Constitution.

The decision in Brooks v. Town of Brooklyn, 146 Iowa, 136, pertained to the proposed erection of a municipal theatre. It obviously deals with a structure quite unlike that contemplated by the city of St. Louis. What the court said to the effect that by reason of the fact that municipal government in Iowa was representative and voting was by ballot, cities in that state were not in need of a public assembly hall like those justifiable where local government was conducted by "town meetings," perhaps puts too much stress upon the method of voting and too little upon the public advantage and need of discussion of public questions. In New England, itself, another view is taken of the effect of the substitution of representative municipal government and voting

by ballot on the public right and necessity to erect and maintain a hall for public assemblages. [Wheelock v. City of Lowell, 196 Mass. 1. c. 227.]

3. It is urged that there is an intent to use the proposed structure, in some instances, for purposes not strictly public in the proper sense. A secret intent of certain individuals, if such an intent exists, cannot

**Unlawful Intent.** be invoked to render illegal a purpose which in itself is legal. It is not to be assumed that a building adapted for public purposes will be used for others which are of such a character as to be unlawful. [Ross v. Long Branch, 73 N. J. L. 1. c. 294.] In case any illegal use of the building is attempted the courts will be open for proper proceedings to prevent it. [Wheelock v. City of Lowell, supra.]

II. The second contention is that, though it be conceded the use is a public one, yet the

**Statutory and Charter Authority.** city is not authorized by statutes or charter to use public money or vote bonds for the purpose in question.

Section 8656, Revised Statutes 1919, authorizes the city of St. Louis and other cities to contract a debt, and Section 8659, Revised Statutes 1919, empowers them to issue bonds evidencing such debt, "for any purpose authorized in the charter of such city, town or village, or by any general law of the State, upon the assent," etc. The applicability of these sections to the city of St. Louis is affirmed in Haeussler v. St. Louis, 205 Mo. 656. In paragraph 8 of Section 1 of Article I of the Charter of the City of St. Louis it is provided that the city shall have power "to acquire or receive and hold, maintain, improve, sell, lease, mortgage, pledge or otherwise dispose of property, real or personal, and any estate or interest therein, within or without the city or State." In State ex rel. Jordon v. Haynes, supra, this court held that the township board of Walker Township was empowered to purchase a site and erect a township hall thereon under a provision "that such board should have

power: To purchase and hold real estate within its own limits, for the use of its inhabitants, subject to the power of the General Assembly, . . ." *In pari materia* was the following: "No township shall possess any corporate powers except such as are enumerated or granted by this act, or shall be especially given by law, or shall be necessary to the exercise of the powers so enumerated." In Clarke v. Inhabitants of Brookfield, supra, a forfeiture was adjudged against the town for failure to erect, within a specified time, a building containing a town hall as required by a condition in a deed of gift. The defense was want of power to comply with the condition. The court held that the power had been given by a section which provided that the board of trustees "may purchase, hold and receive property, real and personal, within such town, and no other, . . . and may lease, sell and dispose of the same for the benefit of the town" and "to borrow money for the improvement of the town." Cases cited hold that a power to expend money for "other necessary charges" or for "other corporate purposes" or "for other public purposes" empowers a city to erect a town hall. In paragraph 15 of Section 1 of Article I of the Charter it is provided that the city may "acquire, provide for, construct, regulate and maintain and do all things relating to all kinds of public buildings, structures, markets, places, works and improvements." In paragraph 35 of Section 1 of Article I, the city is authorized "to exercise all powers granted or not prohibited to it by law or which it would be competent for this charter to enumerate." In Section 1 of Article XVII it is provided that bonds may be issued for enumerated purposes, among which are "charitable, corrective and penal institutions; for courthouses and other public buildings, public parks, parkways, boulevards, grounds, squares, river and other public improvements which the city may be authorized and permitted to make, . . ." In this connection it is provided that "the foregoing enumeration shall not be construed to limit any general provisions of this charter authorizing the city to bor-

row money, or issue and dispose of bonds, and such general provisions shall be construed according to the full force and effect' of their language as if no specific purposes had been mentioned; and the authority to issue bonds for any of the purposes aforesaid is cumulative and shall not be construed to impair any authority to make any public improvements under any provision of this charter or any law." In connection with the vestiture of powers in the city the following provision (Sec. 2, Art. I) appears in the charter: *"Rule of Construction.* The enumeration of particular powers in this charter is not exclusive of others, nor restrictive of general words or phrases granting powers, nor shall a grant or failure to grant power in this article impair a power granted in any other part of this charter; and whether powers, objects or purposes are expressed conjunctively or disjunctively they shall be construed so as to permit the city to exercise freely any one or more such powers as to any one or more such objects for any one or more such purposes." In St. Louis v. Baskowitz, 273 Mo. 1. c. 556 et seq., will be found a discussion which throws light upon the rule of construction applicable under the quoted charter provisions. There are other decisions which support the view that the city in this case was fully authorized to incur the indebtedness. [Wilkerson v. Lexington, supra, par. 6 and cases cited; Greeley v. People, 60 Ill. 1. c. 22; McLin v. Newbern, 70 N. C. 12; Bates v. Bassett, 60 Vt. 1. c. 534; Powers v. Village of Chisholm, 146 Minn. 308; Wheelock v. Lowell, supra, 1. c. 224; Hubbard v. Taunton, 140 Mass. 467.]

It may be added that the Board of Aldermen in passing the bond ordinance and the people (who made the charter) in approving the loan by a decided majority have construed the charter in accordance with the conclusion we have reached, which is that the purpose is public and the city has due authority in the premises. This disposes of the questions presented.

The judgment is affirmed. All concur, except *Walker*, *J.*, who dissents.